## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

RACHEL LYNN WILLIAMSON and
CONSTANCE NOVOA, on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.                                                                    Case No. 1:24-cv-01526-TWP-MJD

GERARDO LORENZO LINARDUCCI,
an Indiana individual,
INTEGRITY WEALTH PARTNERS, LLC, an
Indiana limited liability corporation, and
DUCCI ENTERPRISES, LLC, an
Indiana limited liability corporation,

Defendants.

### AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Rachel Lynn Williamson and Constance Novoa, individually and on behalf of

all others similarly situated, by and through their undersigned attorneys, file this Amended

Complaint against Defendants DUCCI ENTERPRISES, LLC, an Indiana limited liability

corporation[1], and INTEGRITY WEALTH PARTNERS, LLC, an Indiana Limited Liability

Corporation (Ducci Enterprises, LLC, and Integrity Wealth Partners, LLC are hereafter referred

to as "Defendants"). Plaintiffs allege the following upon information and belief, except as to

those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs'

information and belief is based upon, among other things, counsel's investigation, which

---

[1] On June 27, 2025, defendant Linarducci filed a voluntary petition for bankruptcy under Chapter 13 of the
bankruptcy code, resulting in an automatic stay of this proceeding as to him individually. This Court determined that
the claims against defendant Linarducci in Plaintiffs' Complaint (Doc. 1), which remains operative only against
Linarducci,  are subject to the automatic bankruptcy stay can be severed from the claims against the entity
defendants. *See* Doc. 32. If and when the automatic stay is lifted, Plaintiffs intend to further amend to assert the
allegations made herein against defendant Linarducci.

1

includes but is not limited to: (a) Documents filed in *SEC v. DRIVE PLANNING et. Al.,* Northern District of Georgia 1:24-cv-03583-VMC; (b) Documents obtained by Plaintiffs and other putative class members from Defendants; (c) Documents and sales materials produced to the public at large when Drive Planning was selling investments; and (d) Review of other publicly available information concerning Defendants.

## I. **INTRODUCTION**

1.    More than 2,000 investors from Indiana and elsewhere were victimized by a Ponzi scheme under which they were induced and encouraged to invest large sums of money with a promised return of ten percent interest every three months. Investors were urged to use whatever money they had, including their savings, IRAs, pension plans, retirement accounts, mortgages and/or open lines of credit to participate in what, unbeknownst to them, was a fraudulent scheme.

2.    The Ponzi scheme was orchestrated and carried out by Drive Planning, LLC ("Drive Planning") and its founder, Russell Todd Burkhalter ("Burkhalter"), both of whom have recently been charged by the Securities and Exchange Commission ("SEC") with originating and engaging in a $300 million Ponzi scheme that defrauded over 2,000 investors. According to the SEC's complaint, filed in the U.S. District Court for the Northern District of Georgia, Drive Planning and Burkhalter lured investors with promises of lucrative returns through purported real estate investments which in reality were unregistered securities in the form of Real Estate Acceleration Loans (REAL). *See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* No. 1-24-03583 (N.D. GA, filed August 2024) (aka "SEC Action")**.**

3.    GERARDO LORENZO LINARDUCCI ("Linarducci"), an Indiana-based broker who had been employed by Drive Planning, and Defendant INTEGRITY WEALTH

PARTNERS ("IWP"), a financial advisor/wealth management firm in which Linarducci is a principal, and Defendant DUCCI ENTERPRISE, LLC,  a firm in which Linarducci is a principal, recommended that the Plaintiffs and countless others invest in Drive Planning, ignoring their risk-tolerance and causing them to lose large sums of money. As alleged in the SEC complaint, Burkhalter actually used the unsuspecting investors' funds to pay earlier investors and to finance his own extravagant lifestyle, including purchasing a multimillion-dollar yacht, luxury cars, and private jets. Defendants were aware, or should have been aware, that their investors' money was unsecured and that the investment vehicle was nothing more than a massive scheme to defraud. Burkhalter and Drive Planning are not named in this action because of a pending injunction that prohibits actions against Burkhalter and Drive Planning by investors in the pending SEC Action.

4.    Plaintiffs bring this action on behalf of themselves and a proposed class of investors to recover funds misused, commingled, and stolen by Burkhalter and Drive Planning on the direct recommendations of Defendants IWP and DE.

## II.    **PARTIES**

5.    Plaintiff, RACHEL LYNN WILLIAMSON ("Williamson"), is a citizen of Indiana and domiciled in Indiana.

6.    Plaintiff, CONSTANCE NOVOA ("Novoa") is a citizen of New Jersey and domiciled in New Jersey.

7.    Linarducci, is an Indiana-based broker who had been employed by Drive Planning during all times relevant herein. Linarducci is a citizen of Indiana and domiciled in Indiana.

8.    Defendant INTEGRITY WEALTH MANAGEMENT, LLC ("IWM") is an Indiana limited liability company whose primary place of business is 12931 Girvan Way, Crown Point, IN, 46307.  IWM is wholly owned by Linarducci.

9.    Defendant DUCCI ENTERPRISES, LLC ("DE"), is an Indiana limited liability company whose primary place of business is 12162 Pearl Bay Ridge, Indianapolis, IN, 46236. DE is wholly owned by Linarducci.

## III.    JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78a, 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

11.  This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (codified at 28 U.S.C. §§ 1332(d)(2)). At least one member of the Class is a citizen of a different state than the Defendant, there are more than one hundred members of the Class, and the aggregate amount in controversy exceeds five-million dollars ($5,000,000).

12.  Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because all defendants are residents in the State of Indiana and a substantial part of the events or omissions giving rise to Plaintiff Investors' claims occurred in this District.

## IV.    FACTS COMMON TO ALL COUNTS

**The Beginnings of the Ponzi Scheme**

13.    In 2020, Drive Planning began offering to the public what it described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." Burkhalter named the investment vehicle "REAL" (an acronym for "Real Estate Acceleration Loan").

14.    As part of its public offering, Drive Planning sponsored numerous events, promoting its investments on the sides of race cars and on a billboard at Tampa Bay Rays games

at Tropicana Field in St. Petersburg, Florida.





15.     On September 22, 2020, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account. From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of $6.

16.     On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA. Of this total, $90,671 in funds (the beginning Truist balance and the $6 deposit) were unrelated to REAL investments. This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds.

17.     The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive Planning. The terms of that investment called for principal and fixed return to be paid in October 2020.

**The Expansion of the Ponzi Scheme**

18.  Beyond the REAL promotional materials and other website content, Burkhalter and Drive Planning increased the inflow of cash from REAL investors by recruiting and paying sales agents, identified as "financial consultants" on the Drive Planning website.

19.  Burkhalter and Drive Planning paid sales agents, including Linarducci, a four percent commission on each REAL investment he or she sold, including on amounts that investors chose to "rollover" into a new 90-day investment. They further motivated sales agents by creating two clubs for top sales performers: The Presidents Club and the Chairman's Council. Entry into the clubs required selling a certain amount of Drive Planning products, including REAL.

20.     Sales of $2,500,000 entitled the sales agent to membership in the President's Club. Sales of $4,500,000 entitled the sales agent to membership in the Chairman's Council. Membership in each group entitled the sales agent to an all-expense-paid trip for two to destinations including Toronto, Cabo San Lucas, and the Greek Isles.

21.     The sales plan worked. Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, Burkhalter and Drive Planning, with the assistance of sales agents such as Linarducci, raised more than $336 million from more than 2,000 investors in at least 48 U.S. states, as well as other countries, with $66.9 million of that amount coming from retirement accounts.

22.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments. Drive Planning did not use accounting software, nor did it keep typical financial or accounting records.

23.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to investors. Based on the Spreadsheet, Drive Planning owes REAL investors $287,000,000, as of May 6, 2024. According to the SEC Staff Accountant Cody C. Turley, who reviewed the available bank records approximately match these values, showing Burkhalter and Drive Planning raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024. SEC Staff Accountant Turley has also sworn in an affidavit in the SEC Action that from September 2020 through June 2024, the $372 million that was raised from investors came from more than 2,500 investors that invested funds in the REAL program at Drive Planning.

24.     Bank records show that Drive Planning transferred $65 million to Automatic Data Processing, Inc. ("ADP"), Drive Planning's payroll processor. While Drive Planning did have a few W2 employees whose salaries may be included in that figure, the vast majority of that amount was commission payments to sales agents.

25.     Because Drive Planning received only $17.6 million from sources other than REAL investors, at least $47.4 million of the above-mentioned $65 million in transfers to ADP must have been sourced from investor funds. For one recent two-week period, Drive Planning paid sales commissions of $1.92 million.

**Preserving Capital for the Scheme Through Rollovers**

26.     Drive Planning and the Defendants furthered the scam by prompting investors to roll over their REAL investments, including the supposed 10 percent return, at the end of the

three-month term. Drive Planning did so by sending an email to investors at about day 60 of the 90-day term, asking whether investors wanted to make a withdrawal, roll over the supposed balance into a new 90-day investment, or add additional funds to the rollover investment.

27.     In connection with solicitation of an election to withdraw or roll over the investment, Drive Planning (and the other Defendants herein) never disclosed that any withdrawal would necessarily be sourced by, not a profit, but the principal invested by a later REAL investor, nor that any interest credited was a phantom number and not the product of profitable use of the investors' funds.

28.     Drive Planning received $8.8 million in REAL investments in 2021, $63.2 million in 2022, $163.1 million in 2023, and $100.3 million in 2024 (through early May 2024).

29.     There was, however, no viable engine for generating the promised ten percent return. Bank records reveal that, contrary to what it represented to investors and prospective investors, Drive Planning was not deploying the cash from REAL investments into bridge loans to developers or joint ventures with developers.

30.     Unbeknownst to investors, Drive Planning did not receive substantial income from loans to or joint ventures with property developers. Rather, Drive Planning's revenue sources were limited to commissions earned on life insurance sales, membership fees (ranging from $2,000 to $5,000) from clients who received financial planning services, and rental income from a few properties.

31.     From September 1, 2020, to June 2024, Drive Planning's main accounts received deposits of $389.6 million. Of these deposits, at least $372 million (95.4%) were received from investors in the REAL program. During this same period, Drive Planning only received funds

totaling $17.6 million from other sources, with $4 million of that from other investment programs Drive Planning was running.

**Ponzi Scheme Payouts**

32.    Based on the bank records, from September 1, 2020 to June 2024, investors received "returns" of $154.9 million. With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available, at least approximately $137.2 million of the "returns" were Ponzi payments, sourced from investor funds.

33.    Without new investor funds, Drive Planning would not have been able to meet its repayment obligations. For example, in May of 2022, Drive Planning received investor deposits of $3.3 million and non-investor deposits of $41,311 yet paid out $518,874 to investors. In September of 2023, Drive Planning accounts received investor deposits of $16.8 million and non-investor deposits of $270,104 yet paid out $7.1 million to investors.

34.    Since September of 2021, Drive Planning does not appear to have been able to generate enough non-investor funds to repay investors. Based on its purported collateral and historical cash flows, Drive Planning was unable to generate future revenue sufficient to pay its investors, without inducing new investors to invest.

35.    Though Burkhalter pledged, on June 10, 2024, to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, he nevertheless paid sales commissions to Drive Planning sales agents, including Linarducci, on June 21, 2024.

**Defendants' Acts in Furtherance of the Scheme:**

36.     As a sales representative trained and employed by Drive Planning, Linarducci provided potential investors with a "prospectus" consisting of promotional materials produced by Drive Planning which contain a substantial portion of the information required to be included in a Form S-1 SEC registration statement.

37.     The materials included a large-font three-page color brochure (the "REAL brochure") that described REAL in four bullet points:

- 3-month term;

- 10% return;

- Quitclaim deed collateral; and

- $20,000 minimum.

Linarducci's email is included at the bottom of the brochure as contact information, and the brochure also contains a logo from "Ducci University." A copy of the REAL brochure is attached hereto as Exhibit A.

38.     Investments in REAL were and are "securities," as defined by federal securities law.

39.     On behalf of Burkhalter and Drive Planning, Linarducci offered the REAL investments for sale nationwide and accepted investments from international investors. The REAL brochure was promoted to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by reproducing it on the Drive Planning website (www.driveplanning.com), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents.

40.    Another bulleted list on the REAL brochure represented:

- If you have $20,000 you can participate;

- You can use money from your retirement account;

- You don't have to be an accredited investor;

- You can use money from savings;

- You can use money from a line of credit; and

*See* Exhibit A.

41.    The materials also included a FAQ sheet containing detailed answers to several questions, including:

- How does Drive make sure your loan is protected from any potential losses?

- Is the Real Plan too good to be true?

*See* Exhibit A.

42.    In response to the question about how the loans are protected from any potential losses, the brochure contains the following response:

> We've got you covered with millions of dollars in cash and real estate that we own outright. Your loan is due every 90 days, and you can cash out if you want to. This way, even if something goes wrong in the real estate market, the risk is really low.
>
> *Id.*

43.    In response to the question about whether the plan is too good to be true, the brochure contains the following response:

> Actually, this kind of program is pretty common among people who invest in real estate. For instance, if you've watched HGTV, you've probably seen how quickly

11

professional real estate investors can make a profit that's even better than what the REAL Plan offers. Your money is protected by collateral that includes $21 million in cash, plus $92 million worth of real estate as of March 2023. So you can be sure that we and our lenders are protected from any losses.

*Id.*

44.    Burkhalter recruited Linarducci to sell REAL to prospective investors by claiming that Drive Planning would pool their money and loan it out to property developers, and/or enter into joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL said prospective investors.

45.    The interest from property developers in doing business with Drive Planning, however, proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days. In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months. Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle.

46.    According to court documents associated with the SEC's complaint against Drive Planning and Buckhalter, Linarducci told potential investors that he was a "managing director" of Drive Planning. As a sales agent trained by and operating on behalf of Drive Planning, Linarducci falsely told REAL investors that Drive Planning pooled REAL investments and loaned that money out. He promised these investors a guaranteed ten percent return on their money. He did not, however, tell them that the returns would come from new investors' money.

47.     Defendants put their logos on Drive Planning's marketing materials without conducting adequate due diligence to confirm that returns promised to investors were actually being paid from proceeds identified on the marketing materials. *See* Exhibit A.

**Gerry Linarducci Solicited Plaintiffs Rachel Lynn Williamson and Constance Novoa to Invest in Unregistered Securities While Unlicensed to Sell Securities.**

48.     On September 17, 2022, Linarducci induced Plaintiff Williamson to sign a REAL agreement in which she loaned a principle sum of $22,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three month period. The agreement states that a new note is not required for each new three-month period. The agreement contains an assurance that the note is to be secured by real property located in Drive-Embry Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the September 17, 2022 loan agreement is attached hereto as Exhibit B.

49.     On December 14, 2022, at the behest of Linarducci, Plaintiff Williamson signed a REAL agreement in which she loaned a principal sum of $90,000 to Drive Planning and was guaranteed an interest rate of ten percent to be payable in three months, with an option to roll over all or part of that amount at the same or current rate for another three month period. The agreement contained an assurance that the note is to be secured by real property located in Drive-Embry Portfolio Properties, until the loan was paid back in full. The agreement was signed by Burkhalter, CEO, Drive Planning. A copy of the December 14, 2022 loan agreement is attached hereto as Exhibit C.

50.     From August 2022 through July 2024, at the behest of Linarducci, Plaintiff Novoa invested a total of $50,351.04 in the REAL agreements offered by Drive Planning. Pursuant to

instructions from Linarducci, she continued to roll over her entire original investment of $25,000.00, plus periodic additional investments of principal, for three months at a time with the understanding that she was guaranteed an interest rate of ten percent. A copy of Novoa's transaction history with Drive Planning through Linarducci is attached hereto as Exhibit D.

51.     Each of the Drive Planning REAL agreements, aka promissory notes, are in actuality "securities" under state and federal securities laws.

52.     Gerry Linarducci, and the agents who worked under or with him, were not registered to sell securities. They lacked any Series 7 general securities representative license, was not a registered representative under Financial Regulatory Authority rules, or, was not licensed as an investment advisor with the SEC.

53.     The REAL agreements, aka promissory notes, were sold in a public offering through the marketing materials disseminated by Defendants (Exhibit A) which constitute a prospectus.

54.     The REAL agreements, aka promissory notes, were not sold on any national securities exchange.

55.     On August 17, 2023, Williamson received an "End of 90 day loan Statement" from Drive Planning in which she was informed that her loan balance (presumably on the original September 17, 2022 loan) was now $29,282 and would be $35,431.22 on December 17, 2023, if she chose to roll it over for another three months. Williamson chose to roll over the entire amount. A copy of the "End of 90 Day" statement is attached hereto as Exhibit E.

56.     On June 16, 2024 and again on June 17, 2024, Williamson texted Linarducci to inquire as to why she had not yet received her funds from Drive Planning. A copy of the text messages is attached hereto as Exhibit F.

14

57.     On June 18, 2024, still having not received a response, Williamson texted Linarducci to express her concern that she had not received any replies from somebody in his office named Mary and her growing concern that she was not going to get her funds back. Linarducci informed her he would not be returning from vacation until June 23 and said he did not have Mary's phone number. Williamson replied by asking whether there was a chance she would not receive her money, and she received no response.

58.     On the evening of June 23, 2024, the day on which Linarducci had stated he would be back from vacation, Williamson texted him to ask whether they could speak the next day regarding her withdrawal of funds. There was no response.

59.     Three times on June 24, 2024 and twice on June 25, 2024, Williamson texted Linarducci to request that he call her about her investments, with no response. In her second text on June 25, Williamson beseeched Linarducci to respond to her messages and expressed concern about her life insurance account and her investments with Drive Planning. Linarducci gave her a phone number to call regarding her life insurance and informed her that he had resigned his position with Drive Planning and was not allowed to speak on any Drive Planning terms or contracts. Williamson asked for a referral to another advisor.

60.     On June 25, 2024, Linarducci forwarded to Williamson a text message from Buckhalter indicating that he and Drive Planning were under scrutiny by the government.

**Orders Granting Motion to Appoint Receiver and Motion for Preliminary Injunctive Relief**

61. On August 13, 2024, the United States District Court for the Northern District of Georgia granted the SEC's Motions to Appoint a Receiver and for Preliminary Injunctive and other Equitable Relief against Drive Planning and Buckhalter. The Court found that the appointment of a receiver was necessary and that the SEC had established a prima facie case that

Drive Planning and Buckhalter had engaged in and, unless restrained and enjoined by order of the Court, will continue to engage in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. §17q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. *See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* Doc. 10 & 11, No. 1-24-03583 (N.D. GA, August 13, 2024).

## CLASS ALLEGATIONS

62.    Plaintiffs bring their claims on behalf of themselves and the following plaintiffs: All individuals who invested in DRIVE PLANNING LLC through any company owned or controlled by (1) GERARDO LORENZO LINARDUCCI, (2) INTEGRITY WEALTH PARTNERS, LLC, or (3) DUCCI ENTERPRISES, LLC.

63.    Excluded from the proposed Class and subclasses are Judicial Officers, the Court Appointed Receiver, Defendants, and their respective officers, directors, employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiff reserves the right to amend the Class definition as necessary.

64.  Certification of the Class is appropriate and warranted under Federal Rule of Civil Procedure 23.

65.  The members of the Class are so numerous that separate joinder of each member is impracticable. There are at least 100 or more clients of the Defendants who were solicited to invest in the REAL program at Drive Planning. Although the number of Class members and their names are presently unknown, this information can be readily determined from Drive Planning's records.  SEC filings and associated documents.

16

66. Plaintiff's contentions raise predominately questions of law or fact common to each member of the Class. These common legal and factual questions include, but are not limited to, the following:

(A) whether Defendants violated § 12(a)(2) of the Securities Act;

(B) whether Defendants committed negligent misrepresentation;

(C) whether Defendants committed common law fraud;

(E) whether Defendants breached their fiduciary duty to Plaintiff and the Class;

(F) whether Defendants committed professional negligence;

(G) whether Defendants violated the Indiana Securities Act; and

(G) whether Plaintiff and Class members are entitled to a claim for unjust enrichment or other equitable relief.

67. Plaintiffs' claims are typical of the claim of each member of the Class, because, *inter alia*, all Class members were injured through the misconduct alleged herein. Plaintiff is advancing the same claim and legal theories on behalf of herself and all members of the Class.

68. Plaintiffs will fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs are willing and prepared to serve the Court and the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

69. The questions of law or fact common to the claim of each member of the Class predominate over any question of law or fact affecting only individual members of the Class.

70. Finally, class representation is superior to other available methods for the fair and

efficient adjudication of the controversy. In particular:

    A) there is little economic incentive or other interest of Class members to individually prosecute separate claims,

    (B) Plaintiffs are unaware of any other pending litigation to which any member of the Class is a party and in which any question of law or fact controverted in the subject action is to be adjudicated,

    (C) it is certainly desirable to concentrate this litigation in Defendants' home forum, where a receiver can be appointed, and

    (D) there appear no difficulties likely to be encountered in the management of the claim or defense on behalf of the Class.

    (E) Judicial determination of the common legal and factual issues essential to this case would thus be far more efficient and economical as a class action than in piecemeal individual determinations.

## V. CLAIMS

### COUNT I
### Violation of Section 12(a)(2) of the Securities Act of 1933
### [Against Defendants]

71. Plaintiffs restate and reallege paragraphs 1 through 70 as though fully set forth herein as paragraph 71.

72. For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

73.    Each Defendant was a seller, offeror, and/or solicitor of sale of the REAL agreements to encourage and facilitate investment in the Drive Planning investment vehicle under Section 12(a)(2) of the Securities Act and pertinent common law.

74.    Each Defendant offered, sold, and/or solicited a security, namely the REAL agreements, by and through making untrue and/or misleading statements of material fact that, in his exercise of reasonable care, he should have known were false.

75.    Defendants solicited Plaintiffs in person, over the telephone, through the mail, and through email.

76.    Defendants actively solicited the sale of Drive Planning's REAL agreements to serve the interests of Drive Planning, its founder, and himself.

77.    The materials disseminated by Defendants (*see* Exhibit A) constitute a prospectus within the meaning of the 1933 Act because they contain a substantial portion of the information. that would be required in an SEC registration statement (Form S-1), including:

- summary information about the investments;

- risk factors;

- the ratio of earnings to fixed charges;

- use of the proceeds;

- plan of description;

- description of securities to be registered;

- description of the business;

- information about the seller, including quantitative and qualitative disclosures about market risk.

*See* Exhibit A.

19

78.     Plaintiffs did not have access to the type of information normally provided in a SEC registration statement such as Form S-1, as this was an unregistered non-exempt offering.

79.     At the time they invested in the REAL agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue and did not know that material facts described above were undisclosed.

80.     Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions committed by Defendants.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants IWP and DE on behalf of Plaintiffs and the class and award compensatory damages in an amount in excess of **$5,000,000** and grant any and all further relief that the Court deems necessary or appropriate.

## COUNT II
### Negligent Misrepresentation
### [Against Defendants]

81.     Plaintiffs restate and reallege paragraphs 1 through 70 as though fully set forth herein as paragraph 81.

82.     To induce Plaintiffs to invest in REAL, Defendants negligently and carelessly made material misrepresentations and omissions as described in detail above.

83.     Defendants were negligent and/or careless in ascertaining the truth of the statements made to Plaintiffs and/or they were negligent and/or careless in omitting material facts in statements made to Plaintiffs when inducing them to enter into the REAL agreements.

84.     Defendants made such negligent and careless misrepresentations and omissions for the purpose of inducing Plaintiffs to invest in the Notes.

85.     Investments in REAL were and are "securities," as defined by federal securities law.

86.     As sellers of securities, Defendants had a duty to communicate accurate information to Plaintiffs and not misrepresent information. Plaintiffs relied on Defendants to provide them with accurate information.

87.     Defendants are in the business of supplying information for the guidance of others in their business transactions.

88.     Plaintiffs justifiably relied upon the negligent and careless misrepresentations and omissions of Defendants, as described herein.

89.     If Plaintiffs had known the truth, they would not have invested in the REAL agreements with Drive Planning.

90.     Defendants' conduct amounts to malice or gross negligence indicating a wanton disregard for Plaintiffs' rights.

WHEREFORE, Plaintiffs respectfully requests entry of Judgment in her favor and on behalf of the class and against Defendants as follows:

1. Damages in excess of $5,000,000;
2. Punitive damages in amount sufficient to punish Defendants' willful and wanton conduct and deter others similarly situated from engaging in such conduct;
3. Interest;
4. Costs of suit; and
5. Such other and further relief as the Court deems just and proper.

**COUNT III**
**Common Law Fraud**
**[Against Defendants]**

91.     Plaintiffs restate and reallege paragraphs 1 through 70 as though fully set forth herein as paragraph 91.

21

92.    As alleged above, Defendants made material misrepresentations of material fact and/or omitted material facts.

93.    As an example of Defendants' material misrepresentations, on November 19, 2023, Defendants compiled a multi-page packet to send to Drive Planning and Burkhalter revealing Defendants were fully aware that each property purportedly being used as collateral to secure the REAL investments on the prospectus (Exhibit A) was valued substantially over the amount for which they had just been purchased.  A copy of Linarducci's November 19, 2023 e-mail is attached hereto as Exhibit G.

94.    The email sent by Defendants on November 19, 2023 reveal that Defendants knew the representations made in the prospectus (Exhibit A) were demonstrably false.

95.    These misrepresentations and/or omissions were made intentionally, or at a minimum, recklessly or with culpable ignorance, to induce reliance thereon by Plaintiffs when making decisions to invest REAL.

96.    These misrepresentations and/or omissions constitute fraud and deceit under the common law.

97.    Plaintiffs actually and reasonably relied upon the representations and/or omissions when making decisions to invest in REAL and did not know of any of the misrepresentations or omissions.

98.    As a direct and proximate result of this fraud and deceit, Plaintiffs suffered damages in connection with their investments in REAL.

99.    Defendants' wrongful conduct, as described above, was malicious, reckless, willful, and was directed at members of the investing public. Accordingly, punitive damages, in

addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind in the future.

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor and on behalf of the class and against Defendants, granting the following relief:

1. Damages in an amount in excess of $5,000,000;
2. Punitive damages in amount sufficient to punish Defendants' willful and wanton conduct and deter others similarly situated from engaging in such conduct;
3. Interest;
4. Costs of suit; and
5. Such other and further relief as the Court deems just and proper.

## COUNT IV
## Breach Of Fiduciary Duty
## [Against Defendants]

100.        Plaintiffs restate and reallege paragraphs 1 through 70 as though fully set forth herein as paragraph 100.

101.        Linarducci held himself out as a financial advisor with superior knowledge and experience in investments.

102.        Indeed, Linarducci described himself on his website as a 30-year expert in the financial services industry, a "financial strategist," at https://www.gerrylinarducci.com/:



a.

b.   "Gerardo 'Ducci' Linarducci is a financial strategist, menot (sic), author, and

managing director of Innovative Premier Financial Services/ Over the past 28 years

Ducci and his team have assisted thousands of families and professionals create

financial security they were searching for";

c.   Gerry Linarducci (Ducci) is a well-respected expert in the financial services industry

with an extensive 30-year history as a Retirement Income Specialist, Coach and

Mentor to agents;

d.   Over his career, he has partnered with top professionals including a ten-year tenor

with WPFG and 21st Century Financial earning several awards for leading the

organization and his financial excellence all while enjoying tremendous success.

Ducci leads by example and with a passion and experienced record in his practice to

change people's lives daily;

e.   Partnering with IPFS as a Managing Director, he has a unique opportunity to teach

his craft and knowledge by coaching and growing other agents' practices and

professional development as well as continuing to enjoy providing financial services for his own clients.

f.   Ducci has taken his success a step further, spreading his knowledge worldwide by writing his first book, "Creating Efficient Financial Wealth" which has created a firestorm of others wanting to change their own course in financial wealth. He is rapidly becoming a sought-after transformational speaker for organizations and agents and radio spots. His presence will significantly impact any organization, no matter the industry.

g.   His philosophy is to share what he knows, teach what you don't know and continuously impact the lives of others by understanding his purpose in life and using his God-given talents to enrich others' lives."

103.   Under the common law and Restatement of Agency 425, agents employed to make, manage or advise on investments such as Linarducci, and the companies he uses to sell investments, have a fiduciary obligation to their customer.

104.   By virtue of their roles as de facto financial advisors, de facto broker-dealers, de facto brokers aka financial advisors, aka registered representatives, aka financial consultants, aka investment advisors, and/or de facto private placement agents, the Defendants owed fiduciary duties to Plaintiff and the class, including the duties of loyalty, good-faith, care, full and fair disclosure and duty to:

a. Provide investment advice in Plaintiffs' best interests generally, and under the SEC's Regulation Best Interests (aka Reg BI);

b. Refrain from engaging in activities that conflict with Plaintiffs' interest;

c. Make full and fair disclosure of conflicts of interest to the extent they cannot be avoided;

d. provide reasonably available alternative investments;

d. Investigate Drive Planning before recommending any investment concerning Drive Planning.

e.  the duty to recommend [investments] only after studying it sufficiently to become informed as to its nature, price, and financial prognosis;

f. the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests;

g. the duty to inform the customer of the risks involved in purchasing or selling a particular security;

h. the duty to refrain from self-dealing ...; and

i. the duty not to misrepresent any material fact to the transaction.

105.    Defendants breached the fiduciary duties they owed to Plaintiffs by:

a.      Negligently misrepresenting and omitting the true nature of the investments;

b.      Negligently misrepresenting and omitting the true value of the investments;

c.      Failing to disclose that they failed to reasonably investigate the REAL and CORE investments, including claims made by the issuer, Drive Planning, including but not limited to claims in Drive Planning's brochures and other promotional materials regarding the source of promised proceeds, and claims

26

made by Drive Planning's principal, Todd Burkhalter, as required of financial

advisors and professionals in recommending investments; and

    d.      Other breaches of fiduciary duty as described herein.

106.    Defendants' breach of fiduciary duties caused injury and damages to Plaintiffs.

107.    As a direct or proximate result of Defendants' breaches, Plaintiffs have suffered

damages which consist of investment losses in excess of $5,000,000.

WHEREFORE Plaintiffs respectfully request entry of Judgment in their favor and on behalf of the class and against Defendants as follows:

1. Compensatory damages in excess of $5,000,000;
2. Disgorging from Defendants any fees, commissions or other compensation that they received in connection with causing Plaintiffs to enter into the REAL agreements;
3. Awarding Plaintiffs their costs and expenses incurred in this action;
4. Awarding Plaintiffs punitive damages in an amount sufficient to deter similar misconduct in the future; and
5. Awarding Plaintiffs such other and further relief as is appropriate.

### COUNT V
### Violation of the Indiana Securities Act
### [Against Defendants]

108.    Plaintiffs restate and reallege paragraphs 1 through 70 as though fully set forth

herein as paragraph 108.

109.    Linarducci acted as an agent of INTEGRITY WEALTH PARTNERS, LLC, an

Indiana limited liability corporation, and DUCCI ENTERPRISES, LLC, an Indiana limited

liability corporation, Defendants with both actual and apparent authority, companies through

which he solicited Drive Planning investments.

110.    An "agent" under IC 23-19-1-2, means an individual, other than a broker-dealer,

who represents a broker-dealer in effecting or attempting to effect purchases or sales of securities

or represents an issuer in effecting or attempting to effect purchases or sales of the issuer's

securities. However, a partner, officer, or director of a broker-dealer or issuer, or an individual having a similar status or performing similar functions is an agent only if the individual otherwise comes within the term. The term does not include an individual excluded by rule adopted or order issued under this article.

111.    Linarducci acted as an unregistered agent doing business in Indiana in violation of IC 23-19-4-2.

112.    Under Indiana law, a "Broker-dealer" means a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account.

113.    Further, Drive Planning investments were offered through Linarducci companies, INTEGRITY WEALTH PARTNERS, LLC, an Indiana limited liability corporation, and DUCCI ENTERPRISES, LLC, an Indiana limited liability corporation, who acted as unregistered broker dealers under IC 23-19-4-2(3).

114.    Under Indiana law, a "Security" means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest therein or based on the value thereof; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; or, in general, an interest or instrument commonly known as a "security"; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. IC 23-19-1-2(28).

115.    The Drive Planning investments were unregistered securities, not exempt from registration, sold by unlicensed agents like Linarducci, and unregistered broker dealers like Defendants INTEGRITY WEALTH PARTNERS, LLC, an Indiana limited liability corporation, and DUCCI ENTERPRISES, LLC, an Indiana limited liability corporation in violation of the Indiana Securities Act.

116.    The violations of the Indian Securities Act as alleged in this action are  violations by Defendants that give rise to a civil cause of action and remedies pursuant to I.C. 23-19-5-9, pursuant to which Plaintiff may maintain an action to recover damages, 8% interest from the date of purchase, costs and reasonable attorney's fees determined by the Court.

WHEREFORE, Plaintiffs respectfully requests entry of Judgment in their favor and on behalf of the class and against Defendants, as follows:

1.  Compensatory damages in an amount in excess of **$5,000,000**;
2.  Prejudgment interest, at the maximum rate allowed under Indiana law;
3.  Plaintiffs' attorneys fees, costs and expenses incurred in this action; and
4.  Awarding Plaintiffs such other and further relief as this Court deems appropriate.

### COUNT VI
### Unjust Enrichment
### As an alternative to Counts I through V
### [Against Defendants]

117.    Plaintiffs restate and reallege paragraphs 1 through 70 as though fully set forth herein as paragraph 117.

118.    Through its unauthorized and continued use of Plaintiffs' funds, in the form of sales commissions and awards, Defendants have enjoyed and continue to enjoy an unjust benefit at the expense and to the detriment of Plaintiffs.

119.    Plaintiffs invested much of their life savings and retirement funds with Driver Planning, based upon Defendants' recommendations, with the reasonable expectation that the invested funds would be returned with interest.

120.    Defendants are unjustly reaping the benefits of Plaintiffs' money.

121.    Defendants' retention of Plaintiffs' money violates the fundamental principles of justice, equity and good conscience, which principles require that all such assets be turned over to Plaintiffs.

122.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully requests entry of Judgment in their favor and on behalf of the class and against Defendants, and that the Court award Plaintiffs the following relief:

A.  Restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unjust enrichment;
B.  That Defendants be permanently enjoined and restrained from acting in any manner related to the acts giving rise to the harms alleged herein;
C.  That Plaintiffs recover their costs of suit and reasonable attorneys fees; and
D.  That the Court grant any other legal and equitable relief as it may deem appropriate.

Dated: September 18, 2025

Respectfully Submitted,

/s/ Ross M. Good
Ross M. Good, Esq. (IL Bar No. 6312917; FL Bar No. 0116405)
Shawn M. Good Esq. (IL Bar No. 632932)
The Good Law Group
800 E. Northwest Hwy, Ste 814
Palatine, IL 60074
Ph: (847) 577-4476
Fax: (800) 709-1179
Ross@thegoodlawgroup.com
Shawn@thegoodlawgroup.com

Jeffrey Sonn, Esq. (*Pro Hac Vice Pending*)
Sonn Law Group PA
19495 Biscayne Blvd, Suite 607
Aventura, Fl 33180
Tel 305-912-3000
Fax 786-485-1501
FL Bar No. 773514
Jsonn@Sonnlaw.com

Brian B. Pastor, Esq. (*Pro Hac Vice Pending*)
Sonn Law Group PA
3455 Peachtree Rd NE,
Ste. 500
Atlanta, GA 30326
Tel: 305-912-3000 Ext. 538
Fax: 404-607-7121
GA Bar No. 565860
E-Mail: BPastor@SonnLaw.com

Mark E. Maddox Esq.
Maddox Hargett & Caruso PC
10150 Lantern Rd, Ste 175
Fishers, IN 46037
Tel: (317) 598-2043
Fax: (317) 598-2050
IN Attorney No. 11252-49
mmaddox@mhclaw.com